CENTRAL OF GEORGIA RY. CO. v. WRIGHT, Comptroller General.

(Circuit Court, N. D. Georgia. December 5, 1908.)

1. COURTS (§ 282*)—JURISDICTION OF FEDERAL COURTS—FEDERAL QUESTION.

A suit by a domestic corporation to restrain the collection of taxes imposed by the state on personal property alleged in the bill to have its situs for purposes of taxation in another state involves a federal question and is within the jurisdiction of a federal court, since the taxation by a state of property without its jurisdiction amounts to a taking of the property of the owner without due process of law.

[Ed. Note.—For other cases, see Courts, Dec. Dig. § 282.*

Jurisdiction in cases involving federal question, see notes to Bailey v. Mosher, 11 C. C. A. 308; Montana Ore-Purchasing Co. v. Boston & M. Consol. Copper & Silver Mining Co., 35 C. C. A. 7.]

2. TAXATION (§ 169*)—SITUS OF PROPERTY—PLEDGE OF CORPORATE STOCKS.

A pledge by a Georgia corporation of stock owned by it in a corporation of another state to a New York trust company to secure an issue of bonds, although the stock is delivered to the pledgee and transferred to it on the books of the issuing corporation, and the effect, under the statute of Georgia, is to vest it with the legal title, does not transfer the situs of such stock to New York for purposes of taxation, where the pledgor retains the equitable ownership with the right to vote the stock and receive the dividends thereon and to a retransfer on payment of its bonds, but such stock remains taxable in Georgia to the pledgor, or to a transferee in that state which has succeeded to all of its rights.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. § 292; Dec. Dig. § 169.*]

3. TAXATION (§ 169*)—SHARES IN FOREIGN CORPORATION—EFFECT OF TAXATION IN STATE OF DOMICILE.

A state statute providing for the taxation in that state of the shares of all domestic corporations, wherever held, has no effect upon the right of another state in which shares of such a corporation are owned to tax the same.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. § 292; Dec. Dig. § 169.*]

In Equity. Bill for injunction.

Lawton & Cunningham, for complainant.

John C. Hart, for defendant.

NEWMAN, District Judge. The Central of Georgia Railway Company brings its bill against the Comptroller General of Georgia, and the sheriff of Fulton county, to enjoin the collection of taxes on 15,-000 shares of the capital stock of the Western Railway of Alabama.

an Alabama corporation. The facts necessary to an understanding of the contention here made, gathered from the bill and answer on which the case is submitted, are as follows:

On or about the 21st day of May, 1887, the Central Railroad & Banking Company of Georgia owned the 15,000 shares of Western Railway of Alabama stock (the shares in question), and executed and delivered to the Central Trust Company of New York a deed of trust called the "collateral trust deed," whereby, for the purpose of securing an issue of $500,000,000 of its bonds due on the 1st day of May, 1937, with interest payable semiannually at 5 per cent., did sell and convey to the Central Trust Company of New York, among other stocks and bonds, the 15,000 shares at the par value of $100 per share. The shares of stock were duly transferred by the Central Railroad & Banking Company to the trust company on the books of the Western Railway of Alabama, and a certificate for the 15,000 shares of stock was issued by the Western Railway of Alabama to the Central Trust Company of New York. This deposit of securities was on condition that if the principal and interest on the bonds, of which it was made the trustee, should be paid according to their terms, the said shares of stock hypothecated to secure the same "be reconveyed and retransferred to the railroad company." The stipulation touching the deposit and hypothecation of this stock further provided that the voting power of this stock should be exercised by the railroad company, its successors or assigns, whenever demanded. It further provided that the railroad company "shall also be entitled to receive from said trustee all of the interest coupons maturing on the bonds, and all of the money dividends payable upon the stocks herein conveyed." It further provided that, in the event there was any default on the bonds, the trustee should collect all of the dividends on the stock conveyed, and shall apply the same from time to time to the payment of interest on the bonds secured. The Central Trust Company further stipulated that upon payment in full or redemption of the outstanding bonds secured by the transfer of this Western Railway of Alabama stock, together with the interest which shall have accrued thereon, the trustee obligated himself without unreasonable delay to pay over to the railroad company, its successors or assigns, whatever of the stock remained and the money derived through the execution of the trust created by the trust deed. In the year 1892 the Central Railway & Banking Company was placed in the hands of a receiver by the United States Circuit Court for the Southern District of Georgia, and among the assets of the company was its interest in the 15,000 shares of the stock of the Western Railway of Alabama. The property and assets of the company were administered by the Circuit Court of the United States, through its receivers, and sold under various decrees of the foreclosures of the mortgages upon the property. The 15,000 shares of stock were, together with a number of other securities, pledged on the 19th day of January, 1895, by Comer as receiver, under order and authority of the United States Circuit Court, to the Mercantile Trust Company of New York to secure a loan of $600,000. Subsequently there was a default of the loan of the Mercantile Trust Company, and

the 15,000 shares of stock of the Western Railway of Alabama, together with other securities, were sold under the order of the Circuit Court of the United States for the Southern District of Georgia, and were purchased by the Mercantile Trust Company. Afterwards the Mercantile Trust Company transferred all its rights and interests in this stock to Samuel Thomas and Thomas Ryan, of New York City, who subsequently likewise transferred this stock to the Central of Georgia Railway Company, the complainant in this case. The Central of Georgia Railway Company was a new corporation organized in 1895 for the purpose of taking over, and which did take over, the property, prior to the receivership, owned and controlled by the Central Railroad & Banking Company of Georgia. On the 29th day of April, 1907, the railway company made a supplemental return to the Comptroller General of this Western Railway of Alabama shares, valuing the same at $900,000. Attached to the same was the following:

"The Comptroller General of Georgia claims that Central holds also the following named stocks and bonds, and that they are subject to be assessed for taxation against the Central. This is denied by Central of Georgia Railway Company, which claims and asserts that the stocks and bonds are not its property but the property of Central Trust Company of New York, and therefore not subject to taxation, and furthermore, claims that even if the shares of stock of Western Railway of Alabama hereinbefore named are its property they are not subject to taxation. Subject to this claim, and in order that it may not be treated as a defaulter, and claiming, asserting, and contending that no tax should be assessed against it for them, it returns the following securities at the following valuation, to-wit: 15,000 shares of capital stock Western Railway of Alabama, $900,000."

The Comptroller General rejected this valuation, and placed the value of this stock at $2,210,000. In accordance with the statute of Georgia, this difference between the Comptroller General's and the corporation's valuation of the property was submitted to arbitration, which resulted in the valuation being placed at $1,275,000.

It is alleged in the bill that tax executions have been issued by the Comptroller General against the Central of Georgia Railway Company for taxes upon the 15,000 shares of stock of the Western Railway of Alabama, as follows: An execution for the sum of $6,375, and interest at 7 per cent. per annum from December 20, 1907, being taxes claimed by the Comptroller General to be due the state of Georgia for the year 1907; the second for the sum of $9,562.50, and interest at 7 per cent. per annum from December 20, 1907, being taxes claimed by him to be due to the county of Chatham for said year; the third for the sum of $17,722.50, and interest at 7 per cent. per annum from December 20, 1907, being taxes claimed by him to be due to the city of Savannah for said year; that all these executions were placed in the hands of John W. Nelms, sheriff of Fulton county, and he has levied the same upon the property of the Central of Georgia Railway Company—certain real estate in the city of Atlanta.

The litigation as to the right of the state of Georgia to tax the Western Railway of Alabama stock originated in the suit of Louisville & Nashville Railway Company v. Wright, Comptroller General, in this court, the determination of which suit and the opinion therein is re-

ported in Louisville & Nashville Railway Company v. Wright, Comptroller General, 116 Fed. 669. This suit involved the right of the state to tax the other 15,000 shares of the stock of the Western Railway of Alabama, owned first by the Georgia Railroad & Banking Company, and afterwards and at the time the bill was filed, by the Louisville & Nashville Railway Company. The decision of this court in that case was affirmed by the Circuit Court of Appeals in Wright, Comptroller General, v. Louisville & Nashville Railway Company, 117 Fed. 1007, 54 C. C. A. 672. A reversal of the case by the Supreme Court of the United States is reported in Wright v. Louisville & Nashville Railway Company, 195 U. S. 219, 25 Sup. Ct. 16, 49 L. Ed. 167. After this decision of the Supreme Court of the United States, there was other litigation in the Georgia state courts. The cases are reported in Georgia Railway & Banking Company v. Wright, 124 Ga. 596, 53 S. E. 231, and Central of Georgia Railroad & Banking Company v. Wright, 124 Ga. 630, 53 S. E. 207, and also in Georgia Railroad & Banking Company v. Wright, 125 Ga. 589, 54 S. E. 52, and Central of Georgia Railway Company v. Wright, 125 Ga. 617, 54 S. E. 64, and finally, in Central of Georgia Railway Company v. Wright, and Georgia Railroad & Banking Company v. Wright, 207 U. S. 127, 28 Sup. Ct. 47, 52 L. Ed. 134.

But the important case dealing with the particular question for determination here is Central of Georgia Railway Company v. Wright, 124 Ga. 630, 53 S. E. 207. The right of the state of Georgia to tax these Western Railway of Alabama shares in the hands of the Central of Georgia Railway Company, notwithstanding the situation as to the Central Trust Company of New York, was there distinctly made and determined. The first headnote of that case will show what was decided. It is as follows:

"Stock in an Alabama railroad company whose lines lay outside of Georgia was owned by the Central Railroad & Banking Company of Georgia, a domestic corporation. To secure an issue of bonds, that company conveyed the stock by deed of trust to a New York trust company, and an entry of the transfer of the stock to the trust company was made on the books of the Alabama corporation. The Central Railroad & Banking Company of Georgia went into the hands of a receiver, its assets were disposed of at judicial sale, and the Central of Georgia Railway Company, a new corporation chartered under the laws of Georgia, became the owner of its properties, including the equitable interest in the Alabama stock. The New York trust company has the physical possession of the stock certificate, as well as the legal title thereto, but every beneficial interest, including the right to receive dividends and to vote the stock, as well as the equity of redemption, is owned by the Central of Georgia Railway Company, subject only to its compliance with the terms of the bonds to secure which the deed of trust was given. Held, that the substantial, beneficial ownership of the stock being in the Central of Georgia Railway Company, that company is liable to be taxed thereon in Georgia."

It was conceded in the opinion by Candler, J., that there were many eminent authorities to sustain the opinion that the situs of stock in a foreign corporation, for the purposes of taxation, is at the domicile of the trustee who holds the legal title, but he states that those cases seem to rest on statutory grounds, and that the statutes of the state and decisions of the Supreme Court of the state lay down a different

principle. The decision of the Supreme Court of the state, just referred to, was taken to the Supreme Court of the United States by writ of error from that court, and is reported in 207 U. S. 127, 28 Sup. Ct. 47, 52 L. Ed. 134. An examination of that case as reported will show that the questions here made were not considered by that court, because the case went off on a different ground.

The bill here and now sets up that the assessment of this stock for taxation by the Comptroller General, and the issuance of execution and levying the same on its property, is in violation of its rights under the Constitution of Georgia and of the United States; that its property is taken without due process of law, contrary to the third paragraph of article 1, § 1, of the Constitution of the state of Georgia, and without due process of law, and denying to it the equal protection of the law, contrary to the fourteenth amendment to the Constitution of the United States. It is claimed on the part of the Comptroller General that no federal question is involved in this case. If this be true, this court has no jurisdiction. If the situs of this Western Railway of Alabama stock was in the state of New York in such way as that the state of Georgia could not assert jurisdiction over it for the purpose of taxation, then undoubtedly this tax would be illegal, and would be taking the property of the complainant company without due process of law, and denying it the equal protection of the law. This is the contention of the complainant, and the case made by the bill. Whether this claim of the complainant can be sustained or not, the claim itself presents a federal question. It is the claim made by the complainant which must determine the existence or nonexistence of a federal question. Osborn v. United States Bank, 9 Wheat. 738–823, 6 L. Ed. 204; Tennessee v. Union Planters' Bank, 152 U. S. 454–455, 14 Sup. Ct. 654, 38 L. Ed. 511; Vicksburg Waterworks Company v. Vicksburg, 185 U. S. 65–68, 22 Sup. Ct. 585, 46 L. Ed. 808. The effort by a state to tax, against a corporation of the state, property having its situs in another state, properly pleaded, raises a federal question. Louisville & Jeffersonville Ferry Co. v. Kentucky, 188 U. S. 385–398, 23 Sup. Ct. 463, 47 L. Ed. 513. In this case it is stated in the opinion:

"We decide nothing more than it is not competent for Kentucky under the charter granted by it, and under the Constitution of the United States, to tax the franchise which its corporation, the ferry company, lawfully acquired from Indiana, and which franchise or incorporeal hereditament has its situs for purposes of taxation in Indiana."

And in Railway Company v. Pennsylvania, 198 U. S. 341, 25 Sup. Ct. 669, 49 L. Ed. 1077, in concluding in the opinion the discussion of the question of the existence of a federal question in that case, this is said:

"It is plain that in the case at bar the coal had lost its situs in Pennsylvania by being transported from that state to foreign states for the purposes of sale, with no intention that it should ever return to its state or origin. It was, therefore, as much outside the jurisdiction of the state of Pennsylvania to tax it as was the Indiana franchise in the case just cited (Louisville & Jeffersonville Ferry Company v. Kentucky), and it has been taxed just as directly, as specifically, under the facts stated in this case, as was the Indiana franchise taxed in Kentucky by the valuation of the Kentucky franchise,

which value was increased by the value of the franchise created by Indiana. Taxation of the coal in this case deprived the owner of its property without due process of law, as is held in the above case, and the owner is entitled to the protection of the fourteenth amendment, which prevents the taking of the property in that way."

Considering the questions made to be properly made, and that this court has the jurisdiction to determine them, the merits of the controversy must now be considered. Is the situs of this stock transferred by the Central Railroad & Banking Company to the Central Trust Company of New York, in the manner hereinbefore described, in the state of New York for the purposes of taxation, or is it in the state of Georgia? It has been held by the Supreme Court of the state of Georgia in the case of Central of Georgia Railway Company v. Wright, 124 Ga. 630, 53 S. E. 207 (the headnote of which case was quoted above), that by the transfer of the stock to the Central Trust Company the legal title was vested in it for the purpose of securing the debt—the bonds which the transfer of the stock secured. The statute of Georgia (Civ. Code Ga. 1895, § 2771) was enacted to provide a stronger and more satisfactory security in some respects than that given by a mortgage in Georgia (Civ. Code Ga. 1895, § 2723). It places the legal title in the person intended to be secured. This method of securing debts is in common use now in Georgia, but it has never been held that a person having the legal title in this way as security for a debt, where the possession and control and use of the property remained in the vendor, was liable for tax against the property. A mere passing of the title under this statute for the purpose of securing a debt, considered alone, certainly does not make the vendee liable for the tax.

The serious question to my mind is made by the contention that the present corporation, the Central of Georgia Railway Company, has never had the legal title to this stock, and that all that it had ever held is the equity of redemption. The stock was transferred by the Central Railroad & Banking Company to the Central Trust Company of New York, and during the receivership, as has been stated above, the equity of redemption which the old Central had in this stock was hypothecated in New York to the Mercantile Trust Company, and, default occuring in the debt which equity of redemption was given to secure, the same was sold in the manner stated, and finally came into the possession of this present complainant, the new company. It does not seem to me, however, that this pledge of the equity of redemption in the stock, its sale, and final acquisition by the new company changes materially the attitude of the new company as to its rights against, and liability to, the Central Trust Company from those which existed in the old Central. It does not appear from the contention and argument here that any claim is made by the Central Trust Company of greater or different rights against the new company than it would have had against the old. So far as the record shows, the same situation exists as to voting stock, election of officers and control, and collection of dividends that existed between the old Central Railroad & Banking Company and the Central Trust Company; and the status between the complainant company and the Central Trust Company, to

my mind, is the same as though the stock had been transferred by the present company in the same manner and under the same terms and conditions that it was transferred and pledged by the old Central. This being true, it is a simple pledge by a Georgia corporation of stock owned by it in another corporation to a trust company located in New York to secure a debt, with the right retained in the pledging company to control, receive the dividends, and get the benefit of any enhanced value in the stock pledged. It is now, as to the complainant company, in legal effect a mere pledge with a perfect right of redemption, although, to render the same more effective, the title and possession is in the pledgee. This being true, in my judgment, the situs of this stock for taxation is in Georgia, and the right to tax it by the Comptroller General is properly asserted.

A recent statute of the state of Alabama of March 7, 1907 (Laws 1907, p. 455), is set out in the bill, and it is claimed that the situs of this Western Railway of Alabama stock is fixed by it for the purpose of taxation in Alabama. The act provides for the assessment at its actual market value of all shares of stock in corporations of Alabama to the persons in whose names the shares appear on the books of the corporation. It requires the president or chief officer of the corporation to make out and return, under oath, to the assessor of the county in which the corporation is located, a list showing the total number of shares of the capital stock and the par value thereof, and the name and residence of each shareholder. It then allows a reduction from the aggregate value of these shares of any corporation of the amount at which the real and personal property of the corporation is returned to the tax assessor for taxation, and provides for taxing the residue, if any. It further provides that the amount paid by the corporation for any shareholder as taxes shall be a lien on any interest the shareholder may have in any property owned by the corporation.

If this act of the Legislature of Alabama has any effect at all, it goes to the question whether this stock is taxable at all in Georgia, and, if so, to what extent, in view of the provisions of this Alabama statute. What the schemes of taxation may be of the state in which the physical property of a corporation is located has no effect apparently upon the right of another state in which shares in a corporation are held to tax such shares. Kidd v Alabama, 188 U. S. 730, 23 Sup. Ct. 401, 47 L. Ed. 669; Wright v. Louisville & Nashville Railway Company, 195 U. S. 219, 25 Sup. Ct. 16, 49 L. Ed. 167.

In my opinion, none of the grounds set up here for the granting of an injunction against the collection of this tax are meritorious, consequently the bill must be dismissed, and a decree may be taken to that effect.